**In the United States District Court
for the District of Kansas**

———————

Case No. 6:20-cv-01352-TC

———————

GEORGE B. KELLY, ET AL.

*Plaintiffs*

v.

MORTON SALT, INC.,

*Defendant*

———————

**MEMORANDUM AND ORDER**

    This is a premises liability suit for damages arising from lead exposure. Defendant Morton Salt moves for summary judgment, arguing it did not owe the three individual plaintiffs, George Kelly, Shannon Owens, and Grant Eason, any duty under Kansas law and that, in any event, punitive damages are improper. Doc. 77. Plaintiffs oppose that motion, Doc. 81, and request oral argument to address "substantial factual disputes," Doc. 85. For the following reasons, Plaintiffs' request is denied, and Morton's motion for summary judgment is granted.

**I**

**A**

    **1.** Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "'material' if it might affect the outcome of the suit under the governing law." *Janny v. Gamez*, 8 F.4th 883, 898 (10th Cir. 2021) (quoting *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997)). And disputes over material facts are "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted). Disputes—even hotly contested ones—over facts that are not essential to the

1

claims are irrelevant. Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

At the summary judgment stage, material facts must be identified by reference to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *Delsa Brooke Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1173 (10th Cir. 2020). Affidavits or declarations "used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on matters stated." Fed. R. Civ. P. 56(c)(4); *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021). The court "construe[s] the factual record and reasonable inferences therefrom in the light most favorable to the nonmovant." *Janny*, 8 F.4th at 899 (quoting *Allen*, 119 F.3d at 839–40). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *id.* at 899, or unsupported by the record as a whole, *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Heard v. Dulayev*, 29 F.4th 1195, 1202 (10th Cir. 2022).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

**2.** To recover for negligence, Kanas law requires a plaintiff to prove a duty owed, a breach of that duty, injury, and a causal connection between the duty breached and the injury suffered.[1] *Thomas v. Cty. Comm'rs of Shawnee Cty.*, 262 P.3d 336, 346 (Kan. 2011). Whether a duty exists is a question of law. *Elstun v. Spangles, Inc.*, 217 P.3d 450, 453 (Kan. 2009) (citing *Nero v. Kan. State Univ.*, 861 P.2d 768, Syl. ¶ 1 (Kan.

---

[1] A federal court sitting in diversity applies the substantive law of the state in which it sits, as enacted by the state legislature and interpreted by the state's highest court. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The parties agree that Kansas substantive law applies. Doc. 76 at ¶ 1.d.

1993)). A negligence claim fails if the defendant had no duty to act in a certain manner toward the plaintiff. *Id.*

A landowner's duty to all entrants "is one of reasonable care under all the circumstances." *Wrinkle v. Norman*, 301 P.3d 312, 313 (Kan. 2013) (citing *Jones v. Hansen*, 867 P.2d 303, Syl. ¶ 2 (Kan. 1994)). One factor to consider in determining the extent of that duty is the "foreseeability of harm to the entrant." *Elstun*, 217 P.3d at 453 (quoting *Jones*, 867 P.2d at 310).

There can be no duty where the probability of harm is not foreseeable. *Berry v. Nat'l Med. Servs., Inc.*, 257 P.3d 287, 290 (Kan. 2011). Although ordinarily a question of fact, foreseeability may be determined as a matter of law if there is no genuine dispute of material fact. *See Cullip ex rel. Pitts v. Domann ex rel. Domann*, 972 P.2d 776, 785 (Kan. 1999). Foreseeability is established if the defendant had actual knowledge of a dangerous condition or the condition had existed for such a length of time that in the exercise of ordinary care the landowner should have known about it. *Brock v. Richmond-Berea Cemetery Dist.*, 957 P.2d 505, 511 (Kan. 1998).

### B

**1.** Defendant Morton Salt produces salt for consumer and industrial use and has more than 20 production facilities in the United States, including in Hutchinson, Kansas. Doc. 78 at ¶¶ 1–2; Doc. 81 at ¶¶ 1–2. The Hutchinson plant is an evaporation site where Manistee pans are used to boil brine to render salt slurry. Doc. 78 at ¶¶ 2–3; Doc. 81 at ¶¶ 2–3. The plant facility has three Manistee pans that were built and put into service around 1910 and were decommissioned in 2011. Doc. 78 at ¶ 4; Doc. 81 at ¶ 4. These pans stand three stories tall, weigh several hundred tons, and were "fabricated from a variety of metals and alloys to enhance corrosion resistance against the corrosivity of salt, including 316 stainless steel, 60/40 cupronickel (a 60% copper, 40% zinc alloy), 70/30 cupronickel, copper, Monel 400, Ni-resist cast iron alloys, and steel." Doc. 78 at ¶¶ 4–5; Doc. 81 at ¶¶ 4–5.

Morton took bids for the demolition and removal of the decommissioned pans, Doc. 78 at ¶ 6; Doc. 81 at ¶ 6, and in December 2018, Morton contracted with ABC Demolition Services, LLC, to complete the job, Doc. 76 at ¶ 2.a.iii. ABC Demolition advertised itself as a "full service demolition contractor located in Wichita, Kansas" that "specialize[d] in commercial building demolition projects, interior strip-outs, site clearing," and "concrete and asphalt removal." Doc. 78 at

¶ 10–11; Doc. 81 at ¶ 10–11. It bid to do the work at no cost to Morton, proposing instead to retain the scrap for sale. Doc. 78 at ¶ 9; Doc. 81 at ¶ 9. ABC Demolition's two project proposals represented that it would carry out the projects "in a safe and professional manner that will meet or exceed O.S.H.A. standards," Doc. 78 at ¶ 13; Doc. 81 at ¶ 13, and that the company would "furnish all necessary labor, materials, equipment, machinery, tools and safety gear." Doc. 78 at ¶ 14; Doc. 81 at ¶ 14.

ABC Demolition also accepted the burden of safety and oversight for the project and its workers. Doc. 78 at ¶ 16; Doc. 81 at ¶ 16. Specifically, ABC Demolition contractually agreed it was responsible for abiding by applicable laws and regulations; inspecting the premises before starting and occasionally during the project for dangerous conditions; "initiating, maintaining, and supervising all safety precautions and programs involving [ABC Demolition's] workers and employees in connection with" the project; supervising and directing the work; and bearing responsibility "for all services, methods, techniques, sequences, and procedures for, and coordination of, all portions of the Work under th[e] Contract" except as otherwise stated. Doc. 78 at ¶¶ 17–18; Doc. 81 at ¶¶ 17–18. It also agreed to "supervise and direct the Work" and "not employ any unfit person or anyone not skilled in the task assigned." Doc. 78 at ¶ 19; Doc. 81 at ¶ 19. ABC Demolition's owner and supervisor, Steve Costello, acknowledged that he accepted all of these terms. Doc. 78 at ¶ 20; Doc. 81 at ¶ 20.[2] ABC Demolition provided its employees safety items such as steel-toed boots, glasses, hardhats, gloves, paper dust masks, and fall harnesses. Doc. 78 at ¶ 26; Doc. 81 at ¶ 26. Morton provided hair nets to ABC Demolition's employees, as it does with all visitors in the food-grade facility, Doc. 78 at ¶ 27; Doc. 81 at ¶ 27, as well as ear protection, Doc. 81 at ¶ 125; Doc. 84-2 at ¶ 125. Morton disclosed to ABC Demolition that portions of the pans contained asbestos. Doc. 81 at 2; Doc. 78-11 at 16.

**2.** All three plaintiffs worked for ABC Demolition, Doc. 76 at ¶¶ 2.a.i–ii, and were covered by workers compensation through ABC Demolition's carrier, *see* Doc. 81 at ¶ 115. George Kelly and Shannon Owens worked on the project from its commencement in January 2019. Doc. 78 at ¶ 22; Doc. 81 at ¶ 22. They operated the torch and hammer on the demolition crew. Doc. 78 at ¶¶ 23–24; Doc. 81 at

---

[2] Plaintiffs controvert this statement of fact on the basis that "Morton was in charge of safety on the project," but do not contest that Costello accepted the terms and conditions. Doc. 81 at ¶ 20.

4

¶¶ 23–24; Doc. 84-1 at ¶ 23. Grant Eason joined the team months later in May 2019 and assisted with errands for the crew, acted as a fire watch, and operated the crane. Doc. 78 at ¶¶ 22, 25; Doc. 81 at ¶¶ 22, 25. Steve Costello, ABC Demolition's owner, supervised the crew and communicated with Morton. Doc. 78 at ¶¶ 20, 35; Doc. 81 at ¶¶ 20, 35. Then-Plant Engineer Bryan Smith was the primary point of contact at Morton for ABC Demolition, and he was responsible for assessing progress on the project and enforcing compliance with Morton's contractor safety rules. Doc. 78 at ¶¶ 29–32; Doc. 81 at ¶¶ 29–32.

A month into the project, Kelly and Owens began to observe red smoke while cutting the Manistee pans with the torch. Doc. 78 at ¶¶ 39–42; Doc. 81 at ¶¶ 39–42; *see also* Doc. 78-10 at 22. Eason noticed the red smoke his first day on site. Doc. 78 at ¶ 46; Doc. 81 at ¶ 46. Both Kelly and Owens recognized that the red smoke was coming from the Manistee pans' sealant. Doc. 78 at ¶¶ 47–48; Doc. 81 at ¶¶ 47–48. The sealant was a paint-like substance that appeared to be sprayed or brushed onto joints and bolts, Doc. 78-10 at 15, forming a "crusty seal," Doc. 78-11 at 19. No one from ABC Demolition asked anyone at Morton what the sealant contained. Doc. 78 at ¶¶ 49–51; Doc. 81 at ¶¶ 49–51; Doc. 78-12 at 13.

Costello, who is not a plaintiff in this suit, became sick immediately after the project began. Doc. 78 at ¶ 52; Doc. 81 at ¶ 52. He experienced bone pain and vomiting, and attributed his symptoms to overexertion, heat exhaustion, and smoke inhalation. Doc. 78 at ¶¶ 52, 54; Doc. 81 at ¶¶ 52, 54. He concealed his symptoms from his crew. Doc. 78 at ¶ 52; Doc. 81 at ¶ 52. But his crew also became sick. Doc. 78 at ¶ 53; Doc. 81 at ¶ 53. Eason, who worked farthest from the smoke, did not start feeling sick until July 2019. Doc. 78 at ¶¶ 45, 57; Doc. 81 at ¶¶ 45, 57. Costello and the crew all believed there were suffering from a virus. Doc. 78 at ¶¶ 53, 55; Doc. 81 at ¶¶ 53, 55.

In March 2019, ABC Demolition hired Mose Price, a former Morton employee, to act as a safety supervisor. Doc. 78 at ¶ 61; Doc. 81 at

5

¶ 61.³ Price informed Kelly and Owens that the sealant they were cutting was red lead. Doc. 78 at ¶¶ 62–63, 65–66; Doc. 81 at ¶¶ 62–63, 65–66. After being sick for a few months, Owens went to the doctor in July 2019, believing he had the flu. Doc. 78 at ¶ 69; Doc. 81 at ¶ 69. Based on what he had heard from Price in March, he also requested a test of his lead levels. Doc. 78 at ¶ 69.⁴ Days later, Owens's results returned positive for lead. *See* Doc. 78 at ¶ 70; *see also* Doc. 81 at ¶ 115.

**3.** Morton shut down the demolition immediately after learning of Owens's test results. Doc. 78 at ¶ 71; Doc. 81 at ¶ 71. It cordoned off the area and hired iSi Environmental to take samples from the Manistee pans to find the lead. Doc. 78 at ¶¶ 73, 91; Doc. 81 at ¶¶ 73, 91. Two samples came back positive. Doc. 78 at ¶ 93; Doc. 81 at ¶ 93. OSHA then opened an investigation. Doc. 78 at ¶ 94; Doc. 81 at ¶ 94, 133; Doc. 84-1 at ¶ 133.

Three Morton employees subsequently informed Morton that they were aware of lead on the pans. Mike Ratzloff, a pipefitter in the maintenance department, remembered that lead was used to repair the pans in the 1980s. Doc. 78 at ¶ 76; Doc. 81 at ¶ 76. Don Harrison, a janitor in the production department, and Wes Brandyberry, an engineering assistant, also disclosed their knowledge of lead on the pans. Doc. 78 at ¶¶ 79, 82; Doc. 81 at ¶¶ 79, 82. None of these individuals disclosed their knowledge prior to Morton shutting down the project, Doc. 78 at ¶¶ 77, 80, 83; Doc. 81 at ¶¶ 77, 80, 83, and none held managerial or supervisory positions, Doc. 78 at ¶¶ 78, 81, 84; Doc. 81 at ¶¶ 78, 81, 84. Then-Plant Manager Fredrick Silhan testified that he had

---

³ Plaintiffs dispute that Price was hired as a safety supervisor and instead assert that Price was hired to supervise the crew "because Costello went to a different job." Doc. 81 at ¶ 61. But Plaintiffs' own statement of fact undermines their position. *See id.* at ¶¶ 111–112. Price states that he was hired in March and his initial job "was simply to keep the crew wearing safety equipment and not wander off the job site." *Id.* at ¶ 111 (citing Doc. 81-2 at ¶ 4). It was not until May 2019, Price says, that he was promoted to head supervisor in Costello's place because Costello left for another job site. *Id.* at ¶ 112 (citing Doc. 81-2 at ¶ 5).

⁴ Plaintiffs controvert Morton's statement of fact, alleging instead that Price started talking about the lead in July before Owens sought medical attention. Doc. 81 at ¶ 69. That conclusion is not supported by Owens's own deposition testimony. Doc. 78-11 at 17 ("[Mose] said it was red lead sealer."); *id.* at 10 ("I learned it was lead . . . probably around in March.").

no knowledge of any lead at the facility before Morton shut down the project in July 2019. Doc. 78 at ¶ 74; Doc. 81 at ¶ 74. The current Plant Engineer, Talmage Cox, testified that he did not know of anyone in management that knew about the lead. Doc. 78 at ¶ 75; Doc. 81 at ¶ 75.[5]

**4.** Kelly filed this third party subrogation claim against Morton in December 2020 under the Kansas Workers Compensation Act. Doc. 1; Doc. 81 at 23. Owens and Eason joined the suit in subsequent amended complaints. Doc. 17; Doc. 33.

Plaintiffs claim that Morton acted negligently, Doc. 76 at ¶ 4.a, and seek nearly $3 million plus punitive damages, *id.* at ¶ 5. They press three theories for Morton's negligence: Morton failed to provide a safe working environment,[6] failed to investigate hazardous substances located on the property, and failed to inform ABC Demolition of hazardous substances on the property. *Id.* at ¶¶ 4.a.i–v. Plaintiffs further claim that these duties were nondelegable. *Id.* at ¶ 4.a. Morton offers numerous defenses, Doc. 76 at ¶¶ 4.b.i–ii, iv, vi. It now moves for summary judgment on the basis that it owed no legal duty to Plaintiffs.[7] Doc. 77.

---

[5] Plaintiffs point to a portion of Cox's testimony where he suggests that someone in Morton management "forgot" about the presence of lead on the pans. Doc. 81 at ¶¶ 75, 140. Read in context, Cox testified that he did not know what previous Morton management knew or did not know. Doc. 81-11 at 2–3. Although Cox's comment suggests that someone in Morton's management team had actual knowledge at some point, Cox could not identify anyone who had that knowledge and stated that doing so would be pure speculation. *Id.* at 2. What is clear from the record is that Cox did not have personal knowledge of anyone in Morton management between 2018 and 2019 who knew about the lead. Doc. 78-2 at 13.

[6] This includes Plaintiffs' claim that Morton failed to repair ventilation windows. Doc. 76 at ¶ 4.a.ii.

[7] Plaintiffs requested oral argument under D. Kan. Rule 7.2 to address "substantial factual disputes that exist between the parties." Doc. 85. Rule 7.2 provides that "[t]he court may set any motion for oral argument or hearing at the request of a party or on its own initiative." D. Kan. Rule 7.2. That request is denied. The parties' written submissions effectively explain the parties' positions. Moreover, Morton's statement of fact was largely uncontroverted.

## II

Morton's motion for summary judgment is granted. Although the risk of harm to Plaintiffs may have been reasonably foreseeable to Morton on the basis that Morton's employees' knowledge may be imputed to it under Kansas law, Morton did not owe these Plaintiffs a duty of care under these circumstances.[8]

### A

Morton argues that it did not owe Plaintiffs a duty because none of Morton's managerial or supervisory staff had knowledge of the presence of lead in the Manistee pans. Doc. 78 at 30–32. While Morton admits that three employees knew about the lead on the pans prior to July 2019 when the project was shut down, it argues that their knowledge cannot be imputed to the company because they are low-level employees without management or supervisory authority. *Id.* at 32. That argument is contrary to Kansas law.[9] A reasonable jury could find that Morton knew about the lead sealant, so Plaintiffs' claim does not fail as a matter of law for lack of foreseeability.

---

[8] Morton moved for summary judgment as to Plaintiffs' request for punitive damages. Doc. 78 at 35-38. Because Plaintiffs' claim fails for want of a duty, punitive damages are not warranted. Even if Morton had a duty, no reasonable jury could find clear and convincing evidence that Morton acted wantonly. Kan. Stat. Ann. § 60-3702(c); *Brent v. Walmart, Inc.*, No. 20-cv-01158, 2022 WL 428474, at *1 (D. Kan. Feb. 11, 2022) (first citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986); and then citing *Danaher v. Wild Oats Markets, Inc.*, 779 F. Supp. 2d 1198, 1213 (D. Kan. 2011) (applying Kansas law)). While three of Morton's employees knew about the presence of lead, there is no evidence that Morton realized the imminent danger of the lead or showed reckless disregard or complete indifference to Plaintiffs' wellbeing by permitting them to work on the pans. *Adamson v. Bicknell*, 287 P.3d 274, 281 (Kan. 2012). To the contrary, it hired a contractor—ABC Demolition—based on its expertise and ability to demolish the pans in a safe manner.

[9] Morton's authorities in support of a managerial/non-managerial distinction are not binding on a diversity action under Kansas law. *Contra* Doc. 78 at 32 (first citing *Magnum Foods, Inc. v. Cont'l Cas. Co.*, 36 F.3d 1491, 1501 (10th Cir. 1994) (applying Oklahoma law); then citing *Mountain States Tel. & Tel. Co. v. Occupational Safety & Heath Rev. Comm'n*, 623 F.2d 155, 157–58 (10th Cir. 1980) (applying federal law); and then citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998) (same)).

Whether an employee's knowledge may be imputed to a principal does not depend on the employee's managerial status. The Kansas Supreme Court has recognized corporate knowledge may come from an agent or employee. *City of Ark. City v. Anderson*, 762 P.2d 183, 189 (Kan. 1988) ("A corporation is an artificial person; it may acquire knowledge only through real people—its officers, agents, or employees."); *accord* Restatement (Third) of Agency § 5.03 cmt. c (2006) ("Organizations are treated as possessing the collective knowledge of their employees and other agents, when that knowledge is material to the agent's duties . . . ."). The key to imputation under Kansas law is whether the fact learned is material to the agent or employee's duties. *Golden Rule Ins. Co. v. Tomlinson*, 335 P.3d 1178, 1190 (Kan. 2014) (citing Restatement (Third) of Agency § 5.03). If so, that knowledge is imputed to a principal, even if the agent or employee never communicated his knowledge to the principal. *Conner v. Koch Oil Co.*, 777 P.2d 821, 824 (Kan. 1989) (citation omitted).

Viewed in the light most favorable to Plaintiffs, the factual record supports Plaintiffs' contention that Morton had sufficient knowledge of the presence of lead. Three Morton employees told Morton after the demolition was shut down that they were aware of the lead in the Manistee pans. Doc. 78 at ¶¶ 76–77, 79–80, 82–83. This includes Mike Ratzloff, a pipefitter in the maintenance department, who told Morton that he remembered the maintenance department using lead to repair the Manistee pans in the 1980s. *Id.* at ¶ 76; *see also* Doc. 78-17 at ¶ 25. A reasonable jury could find that the presence of lead in the Manistee pans was a fact material to Ratzloff's duties as a repairman of the pans and thus his actual knowledge of the lead sealant is imputed to Morton under Kansas law, *Golden Rule*, 335 P.3d at 1190, even though Ratzloff did not tell Morton of his knowledge until after the project had ceased, *Conner*, 777 P.2d at 824.

**B**

Morton argues next that it had no duty to protect Plaintiffs from risks arising from demolition of the pans because they were independent contractors of a company—ABC Demolition—specifically hired to remove the pans. Doc. 78 at 22–30. Although Plaintiffs' status as employees of an independent contractor does not categorically bar Morton's duty, that status is an important factor for determining what duty of care Morton owed, if any. Under the circumstances, Morton did not owe Plaintiffs a duty of reasonable care.

9

**1.** Under Kansas law, landowners owe the same duty to all entrants—a duty of "reasonable care under all the circumstances." *Wrinkle v. Norman*, 301 P.3d 312, 313 (Kan. 2013) (citing *Jones v. Hansen*, 867 P.2d 303, 310 (Kan. 1994)). In *Jones*, the Kansas Supreme Court adopted a general duty of "reasonable care under all the circumstances" to give courts flexibility to determine the appropriate duty to each entrant without being bound to "artificial classifications and distinctions." 867 P.2d at 310. This approach softened the harsh results that came with determining duty solely on a plaintiff's status. *Id.* at 309.

Landowners generally owe this duty to employees of independent contractors covered by the Kansas Workers Compensation Act. *Herrell v. Nat'l Beef Packing Co., LLC*, 259 P.3d 663, 675 (Kan. 2011). In *Herrell*, the Kansas Supreme Court recognized the rule in *Jones* that landowners owe a duty of reasonable care under the circumstances to all entrants and held that, apart from limited exceptions, a landowner's duty to employees of independent contractors working on the property is no different. *Id.* It reached this result by interpreting the Kansas Workers Compensation Act. Although the Act bars tort recovery against employers, it permits covered employees to recover against third parties whose negligence caused the employee injury. Kan. Stat. Ann. § 44-504(a); *see also Herrell*, 259 P.3d at 674–75. Because the defendant was neither the employer nor an excluded third party under the statute, it could be held liable to the covered employee under a premises liability theory of negligence and owed the employee a duty of reasonable care under the circumstances. *Herrell*, 259 P.3d at 675.

Morton relies on a pre-*Jones* case to argue that Plaintiffs' status as independent contractors precludes any duty to protect against risks that arise from the condition Plaintiffs were hired to remove. Doc. 78 at 23–24 (citing *Aspelin v. Mounkes*, 476 P.2d 620 (Kan. 1970)). In *Aspelin*, the landowner hired an independent contractor to repair his barn roof, and in the process of making repairs, the contractor fell and was injured. 476 P.2d at 621–22. The contractor's action against the defendant failed on the basis that "an owner of premises is under no duty to protect an independent contractor from risks arising from or intimately connected with defects in the premises which the contract has undertaken to repair." *Id.* at 623.

*Herrell* did not expressly overrule *Aspelin*, but its reasoning suggests that *Aspelin* no longer operates as a categorical bar to absolve a landowner of his duty to an employee of an independent contractor. Considering the text and policy of the Kansas Workers Compensation Act, *Herrell* identified only two categorical bars to landowner liability,

announced first in *Dillard v. Strecker*, 877 P.2d 371 (Kan. 1994). In general, a landowner cannot avoid liability for an independent contractor's negligence when that landowner owes a third party a nondelegable duty or the independent contractor's work is inherently dangerous. *Dillard*, 877 P.2d at 378. But the reasons for that rule do not apply when the injured third party is an employee of the independent contractor hired to undertake the work at issue and can recover under a workers compensation statute. *See id.* at 385 (listing nine policy reasons for limiting recovery when workers compensation is available). For example, permitting an employee of an independent contractor to recover from a landowner in a third-party action based on a landowner's nondelegable statutory duties to its own employees would permit the independent contractor's employee to recover against the landowner where the landowner's own employees would be limited to recovery exclusively under the workers compensation statute. *See id.* at 377–78. To avoid that result, among others, a landowner is not liable to an employee of an independent contractor covered by workers compensation for (i) injuries sustained as a result of the breach of a nondelegable duty imposed upon the landowner by statute or ordinance or (ii) injuries arising out of inherently dangerous activities. *Herrell,* 259 P.3d at 673.

That does not mean *Jones* and *Herrell* "consigned [*Aspelin*] to the ashcan of history." *Contra* Doc. 81 at 27. The Kansas Court of Appeals harmonized the holdings of *Aspelin* and *Herrell* in *Didde v. City of Chapman*, No. 106,090, 2012 WL 3822735 (Kan. Ct. App. Aug. 31, 2012).[10] In that case, an experienced waterline worker hired by a municipality was injured when a pressurized pipe blew a plug. *Didde*, 2012 WL 3822735, at *1. Didde claimed that the city owed him a duty of care because it negligently installed the pipe. *Id.* at *2. Didde argued that the pipe required a cap block and did not dispute that he knew the pipe he

---

[10] Plaintiffs dismiss *Didde* as an unpublished case that is neither precedential nor favored for citation under Kansas Supreme Court Rule 7.04(f). Doc. 81 at 24. That is an accurate observation. But where the state's highest court has not spoken, "decisions of a state's intermediate appellate courts are some evidence of how the state supreme court would decide the issue" and can be considered "even if they are not binding precedent under state law." *Clark v. State Farm Mut. Auto. Ins. Co.*, 433 F.3d 703, 709 (10th Cir. 2005) (quoting *Fransen v. Conoco, Inc.*, 64 F.3d 1481, 1492 n.10 (10th Cir. 1995)). The Kansas Supreme Court has not addressed the interplay between *Aspelin* and *Herrell*, and *Didde* is the only Kansas appellate case that has considered and attempted to harmonize the holdings in those cases. Thus, while not binding, its analysis is both thoughtful and of some aid in predicting how the Kansas Supreme Court might decide this issue were it presented.

was working on did not have that cap. *Id.* at *5. The court found that Didde's knowledge and expertise alerted him that the pipe might be a dangerous condition and that his knowledge and expertise were relevant to whether the city owed Didde a duty of care. *Id.*

*Didde* relied on the reasoning in *Guignet v. Lawrence Paper Co., Inc.*, 859 F. Supp. 515 (D. Kan. 1994), which applied *Aspelin*. The district court in *Guignet* concluded that "courts have generally recognized that the duty owed to an invitee is based on the proposition that an owner has, or at least should have, superior knowledge of the dangers related to the premises." 859 F. Supp. at 519. "That assumption, however, losses its validity when the owner has summoned the invitee onto the premises specifically to repair some defect or condition about which the invitee possesses specialized knowledge or technical skill." *Id.* (citing cases where this rule has been applied in other jurisdictions).

Recognizing that *Jones*, decided after *Aspelin* and *Guignet*, shifted away from the status-based duties, the *Didde* Court explained that *Jones* did not prohibit consideration of an entrant's status as it relates to what duty is owed. 2012 WL 3822735, at *5; *see also King v. G & W Food, Inc.*, 71 F. App'x 770, 774 (10th Cir. 2003) (finding consideration of independent contractor's status consistent with the standard in *Jones*). Because Didde was an experienced waterline worker and observed, or could have discovered, the defect in the pipe he was hired to work on, the city did not owe Didde a duty of reasonable care under the circumstances. *Didde*, 2012 WL 3822735, at *5–6.

**2.** Under the circumstances here, Morton did not owe Plaintiffs a duty of care. Morton hired ABC Demolition for the express purpose of removing the Manistee pans. Doc. 76 at ¶ 2.a.iii. ABC Demolition billed itself as a "full service demolition contractor" that "specialize[d] in commercial building demolition projects." Doc. 78 at ¶¶ 10–11; Doc. 81 at ¶¶ 10–11. ABC Demolition further represented that it would carry out the projects "in a safe and professional manner that will meet or exceed O.S.H.A. standards," Doc. 78 at ¶ 13; Doc. 81 at ¶ 13, and that the company would "furnish all necessary labor, materials, equipment, machinery, tools and safety gear required to perform" the demolition. Doc. 78 at ¶ 14; Doc. 81 at ¶ 14. Based on their contractual obligations, ABC Demolition chose to hire Plaintiffs for their skill and ability in commercial demolition. *See* Doc. 78 ¶ 19 ("[ABC

12

Demolition] shall not employ any unfit person or anyone not skilled in the task assigned.").[11]

ABC Demolition further agreed that its conduct would follow all applicable laws and safety measures. The parties' contract required ABC Demolition to comply with all applicable laws and regulations while working, "take all necessary precautions during the progress of the Work to protect all persons . . . from injury," "carefully inspect Morton's premises before starting any activity and from time to time for dangerous conditions," and take responsibility "for *initiating, maintaining and supervising all safety precautions and programs involving its workers [and] employees* . . . in connection with the performance of the Work." Doc. 78 at ¶¶ 17–18 (emphasis added). Moreover, Costello knew how old the Manistee pans were, possessed a list of the known alloys and metals in the pans—which he described as containing "every alloy known to man"—and recognized that there could be "surprises around every corner" when demolishing metal structures from the early 1900s. Doc. 78-5 at 27. Even assuming that Morton had imputed knowledge of the lead and the risk of harm was foreseeable, all of the circumstances—ABC Demolition's stated expertise, its agreement to take responsibility for all safety precautions for its workers in connection with the demolition project, and the fact that Morton hired ABC Demolition for the express purpose of safely demolishing and removing the pans—demonstrate that ABC Demolition was in the superior position to protect Plaintiffs from the risk of lead in the Manistee pans. *See Didde*, 2012 WL 3822735, at *5.Under these circumstances, Morton did not owe Plaintiffs a duty of reasonable care. *See id.*

Morton did not retain control of any aspect of the demolition project, including ensuring Plaintiffs' safety. *Contra* Doc. 81 at ¶ 28. Plaintiffs cherry-pick portions of the record to argue that Morton controlled anything related to safety and would frequently shut down the project

---

[11] While a closer call, it seems highly likely from the uncontested record that Plaintiffs' position made the dangers posed by the Manistee pans known and obvious—as those terms are applied by Kansas courts—to those in the demolition trade. *See Bonnette v. Triple D Auto Parts, Inc.*, 409 P.3d 865, 871 (Kan. Ct. App. 2017) ("Knowledge of the dangerous condition may be imputed and need not be actual knowledge"); *Wellhausen v. Univ. of Kan.*, 189 P.3d 1181, 1184 (Kan. Ct. App. 2008) (explaining that determining a plaintiff's knowledge of a dangerous condition is an objective test that is satisfied when a reasonable person in plaintiff's position would have recognized the condition); *see also Didde*, 2012 WL 3822735, at *6–8.

13

for safety violations. *Id.* at ¶¶ 112, 126. For example, they point to the deposition of Kelly, a member of the ABC Demolition crew, in which Kelly states that Bryan Smith, Morton's Plant Engineer at the time and point of contact with the ABC Demolition crew, "oversaw the safety" of the project, *id.* at ¶ 126 (citing Doc. 81-1 at 5), and that Morton "was in charge of everything," *id.* at ¶ 129 (citing Doc. 81-1 at 15–16). Plaintiffs also point to an affidavit from Mose Price, who relays that prior to his promotion to project supervisor in May 2019, Morton would write the crew up "at least a dozen times a week for safety violations, such as no hard hats, no safety glasses or hairnets" and that Morton would "shut ABC down if it thought the crew was doing anything unsafe." *Id.* at ¶ 112.

But the complete record, including Kelly's own testimony, shows that Morton delegated responsibility for safety precautions "connect[ed] with the performance of the [w]ork." Doc. 78 at ¶ 18. Kelly's testimony explained that Morton did not direct the day-to-day tasks of the demolition project crew and that he received directions only from ABC Demolition. Doc. 81-1 at 6. He also testified that the extent of Smith's oversight was an hour-long initial safety orientation, periodic check-ins on the job site, and safety meetings "if he thought something needed talked about." *Id.* Those safety meetings did not pertain to demolition safety or anything connected to the Manistee pan project. Rather, Steve Costello, ABC Demolition's owner and supervisor, testified that Morton used the safety meetings only to inform the crew how to properly wear beard nets, which the crew was required to wear in Morton's food-grade facility. Doc. 78-5 at 9.

Similarly, the shutdowns were related to general contractor safety rules, not safety precautions germane to the demolition project. Smith "would assess progress on the project and would point out any violations of the Morton contractor safety rules." Doc. 78 at ¶ 31; Doc. 81 at ¶ 31.[12] Morton provided "toolbox talk" informational sheets that ABC Demolition would download on its own and discuss with the demolition crew. Doc. 78-5 at 10. These sheets were not specific to the pan demolition project—they covered "various" safety issues, Doc. 84-4 at 3, and were available to the general public, Doc. 78-5 at 10. And Morton did not require ABC Demolition to read these general

---

[12] Plaintiffs controvert this fact to the extent that Smith "would do more than 'point out' safety violations," contending that Smith would "shut down the project for safety violation." Doc. 81 at ¶ 31. But this does not controvert that Smith was enforcing Morton's general contractor safety rules.

14

safety documents until after the crew had violated the beard net rule. Doc. 84-4 at 3. Costello testified that Morton would shut down the ABC crew for violations of the beard net rule. Doc. 78-5 at 9. He could not recall any other work stoppage for "danger or cleanliness" other than violations of the beard net rule. *Id.* Costello hired Price to oversee beard net compliance. *Id.* at 9–10. Price expands on Costello's recollection, affirming by affidavit that Morton would shut the ABC crew down "for safety violations, such as no hard hats, no safety glasses or hairnets." Doc. 81 at ¶ 112.

Construing the record in the light most favorable to Plaintiffs, Morton did enforce certain safety regulations, but only those general to all contractors, including those unique to a food-grade facility. Nonetheless, Morton's enforcement of general contractor safety rules is not material. *See Janny v. Gamez*, 8 F.4th 883, 898 (10th Cir. 2021). ABC Demolition's contract with Morton required it to "initiat[e], maintain[] and supervis[e] all safety precautions and programs involving [ABC Demolition's] workers [and] employees . . . in connection with the performance of the [w]ork." Doc. 78 at ¶ 18. The parties do not dispute that ABC Demolition accepted this responsibility. Doc. 78 at ¶ 20; Doc. 81 at ¶ 20. Morton's oversight of ABC Demolition's compliance with general contractor safety rules is not material to whether ABC Demolition accepted the duty to implement safety precautions that would protect its workers in connection with the project, including the risk of lead exposure from demolishing century-old metal pans.

Plaintiffs' suggestion that Morton owed them nondelegable duties under OSHA regulations fares no better. *Contra* Doc. 81 at ¶¶ 135–38. As explained in *Dillard*, in the workers compensation context, an employee of an independent contractor cannot recover against a landowner on the basis that the landowner owed nondelegable statutory duties. 877 P.2d at 385. The Kansas Supreme Court affirmed that exclusion in *Herrell*, concluding there that the plaintiff's theory of recovery, premised on the landowner's violation of an OSHA regulation, was foreclosed by *Dillard*. *Herrell*, 259 P.3d at 675. Plaintiffs offer the expert opinion of Dr. Gary Branum who concludes that Morton had a duty to evaluate workplace safety, follow regulations pertaining to use of cutting torch equipment, provide proper safety equipment, and report the presence of lead to the appropriate authorities. Doc. 81 at ¶¶ 137–38. Each of these alleged duties is premised on a statutory or regulatory duty arising under EPA or OSHA regulations. *See* Doc. 81-9 at 2–5. Any theory of recovery based on these nondelegable regulatory duties is not actionable. *Herrell,* 259 P.3d at 675.

### III

For the foregoing reasons, Plaintiffs' request for oral argument, Doc. 85, is DENIED, and Morton's motion for summary judgment, Doc. 77, is GRANTED.

It is so ordered.

Date: January 12, 2023    s/ Toby Crouse
                          Toby Crouse
                          United States District Judge